ORDERED.

Dated: March 29, 2019

_____
Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re:<br><br>Hillsborough Holdings Corp.,<br><br>    Debtor.<br>_____/ | Case Nos. 8:89-bk-09715 through<br>    8:89-bk-9746 and<br>    8:90-bk-11997<br>Chapter 11<br>(Jointly Administered) |
| In re:<br><br>United States Pipe and Foundry Company, LLC,<br><br>    Debtor.<br>_____/ | Case No. 8:89-bk-9744<br>Chapter 11 |
| United States Pipe and Foundry Company, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>Michael H. Holland, Michael McKown, Joseph R. Reschini, and Carlo Tarley, as Trustees of the United Mine Workers of America 1992 Benefit Plan, et al.,<br><br>    Defendants.<br>_____/ | Adv. No. 8:17-ap-00478-MGW |

## MEMORANDUM OPINION ON
## DISCHARGEABILITY OF COAL ACT CLAIMS

Under the Coal Industry Retiree Health Benefit Act of 1992, coal mine operators are required to (among other things) pay premiums to two retirement funds to pay for health benefits for certain retired coal miners. Related persons—those who shared certain common ownership with coal operators as of July 1992—are jointly and severally liable for premiums due under the Coal Act.

Two years ago, United States Pipe and Foundry Company, which previously shared common ownership with a coal operator, was sued for unpaid Coal Act premiums as a "related person." U.S. Pipe, however, contends that any joint and several liability it had under the Coal Act was discharged in U.S. Pipe's chapter 11 bankruptcy case nearly 30 years ago. In rejecting this contention, the Court concludes that because Coal Act premiums are in the nature of a tax, any premiums that came due after the effective date of U.S. Pipe's confirmed plan were not discharged in U.S. Pipe's earlier bankruptcy case.

### Undisputed Facts

Nearly thirty years ago, Hillsborough Holdings and thirty of its subsidiaries filed for chapter 11 bankruptcy.[1] This adversary proceeding centers on two of those subsidiaries: United States Pipe and Foundry, LLC and Walter Industries, Inc.

---

[1] *In re Hillsborough Holdings*, Case No. 8:89-bk-09715. The chapter 11 cases filed by Hillsborough Holdings and its subsidiaries (Case Nos. 8:89-bk-09715 through 8:89-bk-09746 and 8:90-bk-11997) were jointly administered. Case No. 8:89-bk-09715, Doc. No. 14.

Walter Industries was a holding company that owned several companies, including Jim Walter Resources, Inc., which was a coal mine operator.[2] U.S. Pipe, at the time, shared common ownership with Walter Industries.[3]

In 1992, three years after Walter Industries and U.S. Pipe filed for bankruptcy, Congress passed the Coal Industry Retiree Health Benefit Act of 1992, which became effective February 1, 1993.[4] At the time, coal retirees (and their dependents) had been receiving health benefits from two multiemployer benefit plans established by various collective bargaining agreements between the United Mine Workers of America and the coal industry. Those plans were known as the 1950 Benefit Trust and the 1974 Benefit Trust.[5] The Coal Act was passed to remedy the "looming insolvency" of the 1950 and 1974 Benefit Trusts.[6]

It did so in three ways: First, the Coal Act required coal operators to establish and maintain individual employer plans to provide retiree health benefits for certain retirees.[7] Second, it combined the 1950 and 1974 Benefit Trusts into a new benefit plan known as the Combined Benefit Fund, which covered retirees who were

---

[2] Adv. Doc. 24-4 at Ex. III.

[3] Adv. Doc. No. 24-1, ¶ 16.

[4] Pub. L. No. 102-486, 106 Stat. 2776, 3036 – 56 (codified at 26 U.S.C. §§ 9701 – 9722).

[5] For a thorough discussion of the history leading to the Coal Act, see *LTV Steel v. Shalala (In re Chateaugay)*, 53 F.3d 478, 481 – 86 (2d Cir. 1995).

[6] *Id.* at 484 – 85.

[7] 26 U.S.C. § 9711(a).

receiving benefits from the 1950 or 1974 Benefit Trust.[8] Third, it created a new benefit plan known as the 1992 Benefit Plan, which covered coal miners who had retired before September 30, 1994 but were not eligible for the Combined Fund.[9] At the heart of this proceeding lies the funding mechanisms for the Combined Fund and the 1992 Benefit Plan.

The Combined Fund was funded by annual premiums paid by coal operators who were signatories to one of the earlier collective bargaining agreements dating back to 1950.[10] To determine a coal operator's premium, the Secretary of Health and Human Services was first required to assign each eligible retiree to a coal operator based on who the retiree worked for most recently or the longest.[11] That was required to be done by October 1, 1993.[12] Then, each year, the Secretary of Health and Human Services came up with a per beneficiary premium.[13] A coal operator's Combined Fund premium was assessed on an annual basis by multiplying the per beneficiary premium by the number of retirees assigned to the coal operator.[14]

---

[8] 26 U.S.C. § 9702(a)(1), (2); § 9703(b), (f).

[9] 26 U.S.C. § 9711(a), (b).

[10] 26 U.S.C. § 9701(b)(1), (c)(1); § 9704(a).

[11] 26 U.S.C. § 9704(b)(1); § 9706(a).

[12] 26 U.S.C. § 9706(a).

[13] 26 U.S.C. § 9704(b)(2).

[14] 26 U.S.C. § 9704(b)(1).

The 1992 Benefit Plan had a similar funding mechanism. Each coal operator that was a signatory to a 1998 collective bargaining agreement between the United Mine Workers of America and the coal industry was required to pay a monthly per beneficiary premium for each of the coal operator's beneficiaries who were receiving benefits under the 1992 Plan.[15] Each year, the monthly per beneficiary premium may be adjusted to cover any change in the cost of providing benefits to eligible beneficiaries.[16]

To ensure that the Combined Fund and 1992 Benefit Plans would continue to be funded, the Coal Act also imposes liability on "related persons."[17] "Related persons," under the Coal Act, include companies that shared common ownership with a coal operator as of July 20, 1992.[18] The Coal Act specifically provides that "related persons" are jointly and severally liable for a coal operator's obligation to maintain and establish an individual employer plan, as well as the coal operator's obligation to fund the Combined Fund and 1992 Benefit Plan premiums.[19]

In December 1994, nearly two years after the Coal Act became effective, Walter Industries and U.S. Pipe, along with the other Debtors and various creditors,

---

[15] 26 U.S.C. § 9712(d)(1).

[16] 26 U.S.C. § 9712(d)(2).

[17] 26 U.S.C. § 9704(a); § 9711(a); § 9712(d)(4).

[18] 26 U.S.C. § 9701(c)(2).

[19] 26 U.S.C. § 9704(a); § 9706(a); § 9711(a); § 9712(d)(4).

proposed a chapter 11 plan in their bankruptcy case.[20] Although no specific mention was made of the Coal Act, the proposed plan provided that Walter Industries and another debtor (Jim Walter Computer Services, Inc.) would continue to fund medical benefits for retirees.[21] The proposed plan was silent as to any Coal Act obligations U.S. Pipe may have as a "related person."[22]

In March 1995, this Court confirmed the chapter 11 plan.[23] Under Bankruptcy Code § 1141, as well as the terms of the confirmed plan, the confirmation order discharged any claims against Walter Industries and U.S. Pipe (as well as the other Debtors) that arose before the confirmation order's effective date:

> Except as otherwise expressly provided in the Modified Consensual Plan or this Order, pursuant to Article XII, Section 12.3 of the Modified Consensual Plan and Section 1141(d) of the Bankruptcy Code, the issuance of this Order shall operate as a discharge effective as of the Effective Date, of any and all Debt (as such term is defined in Section 101(12) of the Bankruptcy Code) or Claims against one or more of the Debtors that arose at any time before the effective date . . . . On the Effective Date, the Holder of every discharged Debt and Claim will be permanently enjoined from asserting against any and all of the Debtors or any of their respective assets, any other or further Claim based upon law, rule or regulation or any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than as provided in the [ ] Consensual Plan.[24]

---

[20] Adv. Doc. No. 24-6 & 24-7.

[21] Adv. Doc. No. 24-6, ¶ 5.4.

[22] *Id.*

[23] Adv. Doc. No. 24-8.

[24] Adv. Doc. No. 24-8, ¶ 18; Adv. Doc. No. 24-6, ¶ 12.2.

For the next twenty years, Walter Industries fulfilled its obligations under the Coal Act, including maintaining an individual employer plan and paying premiums to the Combined Benefit Fund.[25] In July 2015, however, Walter Industries filed for bankruptcy a second time—this time in the Northern District of Alabama.[26]

Although it continued to fulfill its Coal Obligations for a short while after filing for bankruptcy, in April 2016, Walter Industries terminated its individual employer plan, dumping 439 of its employees into the 1992 Benefit Plan and triggering liability for monthly premiums for those 439 retirees.[27] But Walter Industries failed to pay the monthly premiums to the 1992 Benefit Plan.[28] By May 2016, Walter Industries had also stopped paying its Combined Fund premiums.[29]

So the trustees for the Combined Fund and the 1992 Benefit Plan sued U.S. Pipe in federal court in Washington D.C., alleging that U.S. Pipe is liable for Walter Industries' obligations under the Coal Act as a "related person."[30] U.S. Pipe, in turn, filed this adversary proceeding seeking a declaration that its Coal Act obligations (if

---

[25] Adv. Doc. No. 24-1, ¶¶ 14, 15, 27 & 29; Adv. Doc. No. 29-1, ¶¶ 7 – 9. One technical note: During the bankruptcy case, Walter Industries was merged into Hillsborough Holdings. Adv. Doc. No. 24-4 at § VII.O.6. The surviving entity was renamed Walter Industries, Inc. After emerging from bankruptcy, Walter Industries changed its name to Walter Energy, Inc. That detail is not significant to the Court's ruling. For ease of reference, then, the Court will refer to Walter Energy as Walter Industries.

[26] *In re Walter Energy, Inc.*, Case No. 2:15-bk-02741, Doc. No. 1.

[27] Adv. Doc. No. 29-1, ¶¶ 7 – 9.

[28] Adv. Doc. No. 24-1, ¶¶ 22 -27.

[29] Adv. Doc. No. 24-1, ¶¶ 28 – 32.

[30] Adv. Doc. No. 1 at Ex. C; Adv. Doc. No. 24-1, ¶ 16.

any) were discharged nearly a quarter century ago under the confirmation order in its bankruptcy case.[31]

The outcome of this proceeding hinges on the nature of the Coal Act premiums. On the one hand, U.S. Pipe contends the premiums gave rise to a preconfirmation contingent claim that was discharged under the express terms of the 1995 confirmation order.[32] On the other hand, the Trustees contend the premiums are taxes that accrue periodically, in which case any taxes that accrued after the effective date of confirmation would not be discharged.[33] This Court must now decide whether the Coal Act premiums are a contingent claim or a tax.[34]

## Conclusions of Law

As a starting point, there is no dispute that the Coal Act premiums give rise to a "claim." Just about any bankruptcy practitioner can recite the

---

[31] Adv. Doc. No. 1.

[32] Adv. Doc. Nos. 1 & 23.

[33] Adv. Doc. No. 29. The Trustees also contend that the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a), precludes this Court from discharging U.S. Pipe's Coal Act liability. Because the Court is ruling, as a matter of law, that U.S. Pipe's Coal Act liability was not discharged, this issue appears to be moot. Even if the issue isn't moot, the Court concludes, largely for the reasons articulated by the Eleventh Circuit in *In re Walter Energy, Inc.*, 911 F.3d 1121, 1136 – 37 (11th Cir. 2018), that Congress did not intend for the Tax Anti-Injunction Act to bar this suit.

[34] It is worth mentioning the peculiar procedural posture of the case. Initially, the Trustees moved to dismiss U.S. Pipe's complaint. Adv. Doc. No. 17. That motion was fully briefed. Adv. Doc. Nos. 17 & 22. At the time, the case was pending before the Honorable K. Rodney May. Before Judge May had a chance to rule on the Trustees' motion to dismiss, U.S. Pipe moved for summary judgment. Adv. Doc. Nos. 23, 29 & 30. The parties argued the dismissal and summary judgment motions together before Judge May shortly before he retired. When Judge May retired, this proceeding was transferred to this Court. This Court will treat the Trustee's motion to dismiss as a motion for summary judgment under Rule 7012(d).

definition of a "claim" by heart: Under Bankruptcy Code § 101(5), a claim is a "right to payment," whether it is liquidated or unliquidated, disputed or undisputed, matured or unmatured, or contingent.[35] Under the Coal Act, the Trustees have a right to payment from U.S. Pipe—both now and back when U.S. Pipe confirmed its plan.[36]

But calling the Coal Act premiums a "claim" doesn't mean the premiums aren't a tax. Tax liability, of course, gives rise to a claim. After all, the IRS has a "right to payment" of unpaid taxes from taxpayers who are in bankruptcy. In fact, the Bankruptcy Code contains numerous references to claims for taxes.[37] The significance of a claim being a tax, at least for purposes of this case, is that it helps determine when the claim arose and therefore whether it was discharged under the confirmation order.

As the Trustees point out, when a statute provides that a tax corresponds to a particular time period, a separate obligation accrues each period.[38] Take

---

[35] 11 U.S.C. § 101(5).

[36] 26 U.S.C. § 9704(a); § 9711(d)(1)(A), (d)(4).

[37] *See, e.g.,* 11 U.S.C. § 502(b)(2) (providing that the court shall, after notice and a hearing, determine the amount of a claim that has been objected to unless "such claim is for a tax assessed against property of the estate"); § 724(b) (providing the manner for distributing property in which the estate has an interest and that is subject to a lien that secures an allowed claim for a tax); § 1305(a)(1) (providing that a "proof of claim may be filed by any entity that holds a claim against the debtor . . . for taxes that become payable to a governmental unit while the case is pending").

[38] Adv. Doc. No. 17 (citing *Christian Coalition of Fla., Inc. v. United States*, 662 F.3d 1182, 1195 (11th Cir. 2011)).

income taxes, for example. Because income taxes are levied on an annual basis, each tax year gives rise to a new tax liability.[39] No one would seriously dispute that a debtor remains liable for income (or other) taxes that accrued after confirmation.

But if the Coal Act premiums are a contingent claim, rather than in the nature of a tax, then the liability would have arisen preconfirmation, when the Coal Act took effect, meaning the Trustees' claim would have been discharged.[40] U.S. Pipe persuasively argues that the Coal Act premiums are a contingent claim.

According to U.S. Pipe, the Coal Act imposed liability on U.S. Pipe for future Combined Fund and 1992 Benefit Plan premiums when the Act became effective on February 1, 1993, more than two years before the confirmation order.[41] It is worth noting that Walter Industries' liability under the Coal Act was predicated, at least in part, on the fact that it was a signatory to a collective bargaining agreement with the Union that predated confirmation by at least two decades.[42] And U.S. Pipe is liable as a "related person" because it shared common ownership with Walter Industries as of July 20, 1992—nearly three

---

[39] *Christian Coal.*, 662 F.3d at 1195.

[40] 11 U.S.C. §1141(d)(1); Adv. Doc. No. 24-8, ¶ 18.

[41] Adv. Doc. No. 23, ¶¶ 16 – 25.

[42] 26 U.S.C. § 9701(b)(1), (3); § 9701(c)(1); § 9712(d)(1), (d)(4).

years before confirmation.[43] As a consequence, U.S. Pipe contends that its Coal Act liability was established as of February 1, 1993 at the latest, even if the premium payments did not come due until some later point in time (twenty years down the road in this case).[44]

In support of this argument, U.S. Pipe relies on the Fourth Circuit Court of Appeals' decision more than twenty years ago in *In re Leckie*.[45] *Leckie* involved two consolidated cases, both of which were filed after the Coal Act was passed.[46] In both cases, the debtors, who were coal operators, attempted to sell their assets free and clear of their Coal Act liabilities over objections by the Combined Fund and the 1992 Benefit Plan.[47]

After both debtors were permitted to sell their assets free and clear of their Coal Act obligations, the Combined Fund and 1992 Benefit Plan appealed. On appeal, the Combined Fund and 1992 Benefit Plan argued that the district courts couldn't adjudicate the debtors' liability for Coal Act

---

[43] 26 U.S.C. § 9701(c)(2)(A).

[44] Adv. Doc. No. 23, ¶ 20.

[45] *Id.* at ¶ 23 (discussing *UNWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal)*, 99 F.3d 573 (4th Cir. 1996). U.S. Piper actually relied more on the bankruptcy court's decision, which explained that the Coal Act premiums were "contingent upon the number of surviving retirees." *UNWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal)*, 201 B.R. 163, 172 (Bankr. S.D. W. Va. 1996). The Fourth Circuit ultimately affirmed the bankruptcy court's decision. *In re Leckie*, 99 F.3d at 580 – 81.

[46] *In re Leckie*, 99 F.3d at 577 – 79.

[47] *Id.*

premiums because the premiums did not give rise to prepetition claims since the premiums had not yet been assessed.[48]

The Fourth Circuit disagreed. Distinguishing the Second Circuit's decision in *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, which held that Coal Act premiums were postpetition claims where the Coal Act was passed six years after the debtor filed for bankruptcy, the Fourth Circuit concluded that the debtors' Coal Act liability arose prepetition.[49] Because Congress intended "claim" to be defined broadly, the Fourth Circuit held that the Combined Fund and 1992 Benefit Plan had "claims" for future premiums.[50]

Although that holding supports U.S. Pipe's argument, *Leckie* is somewhat of a double-edged sword for U.S. Pipe because the Fourth Circuit also held that the Coal Act premiums were taxes. One of the arguments raised on appeal in *Leckie* was that the Tax Anti-Injunction Act precluded the districts courts from authorizing the debtors to sell their assets free and clear of their Coal Act liability. The Tax Anti-Injunction Act generally provides that no suit to restrain the collection of any tax shall be maintained in any court.

To determine if the Coal Act premiums were taxes, the Fourth Circuit looked to a four-part test used by (among other courts) the Ninth Circuit in *In*

---

[48] *Id.* at 579 – 80.

[49] *Id.* at 580 (distinguishing *LTV Steel v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 481-86 (2d Cir. 1995)).

[50] *Id.* at 580 – 81.

re Lorber Industries of California.[51] Under the Lorber test, the premiums are a tax if they are (1) regardless of their name, an involuntary pecuniary burden laid on individuals or property (2) imposed by or under the authority of the legislature (3) for a public purpose (including defraying governmental expenses) (4) under the state's police or taxing power.[52] The Fourth Circuit, in Leckie, held that the Coal Act premiums easily satisfied the Lorber test.[53]

The Fourth Circuit reached the same result two years later in In re Adventure Resources, albeit in a different context.[54] There, the Fourth Circuit considered whether Coal Act premiums were taxes entitled to administrative expense priority.[55] Looking to Leckie, the In re Adventure Resources court held that there was no doubt the Coal Act premiums met the definition of a "tax."[56] As discussed below, so too have the Second and Tenth Circuits.

In In re Chateaugay, perhaps the leading Coal Act case, the Second Circuit first noted that it was uncontested that Coal Act premiums were an involuntary

---

[51] Id. at 582 – 83 (citing Cnty. Sanitation Dist. No. 2 of Los Angeles Cnty. v. Lorber Indus. Of Cal. (In re Lorber Indus. of Cal.), 675 F.2d 1062, 1066 (9th Cir. 1982)).

[52] In re Lorber Indus., 675 F.2d at 1066.

[53] In re Leckie, 99 F.3d at 583.

[54] 137 F.3d 786, 794 (4th Cir. 1998).

[55] Id. at 793 – 94.

[56] Id. at 794.

burden imposed by Congress.[57] Addressing the remaining factors, the Second Circuit observed that the premiums served a public purpose and were imposed under Congress' taxing power.[58] On that last point, the Second Circuit thought it significant that the Coal Act was placed in Subtitle J of the Internal Revenue Code of 1986 and that Congress granted enforcement powers to the Secretary of the Treasury.[59]

In *In re Sunnyside Coal*, the Tenth Circuit largely adopted the Second Circuit's reasoning in *In re Chateaugay*.[60] But the Tenth Circuit also specifically addressed an argument that the Coal Act didn't serve a public purpose.[61] In that case, the chapter 7 trustee tried to, in the Tenth Circuit's words, "refashion [the Coal Act premiums] into collectively bargained payments made under contractual payments between coal operators and the UMWA."[62] But, as the district court in that case explained, "the evident objective of the Coal Act was the preservation of the nation's coal industry by promoting labor peace through the protection of health benefits for those employees of companies that

---

[57] *LTV Steel v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 498 (2d Cir. 1995).

[58] *Id.*

[59] *Id.*

[60] *United Mine Workers of Am. v. Rushton*, 146 F.3d 1273, 1276 – 77 (10th Cir. 1998).

[61] *Id.* at 1277.

[62] *Id.*

discontinued operations."[63] In that respect, the Tenth Circuit reasoned that the Coal Act premiums are similar to unemployment taxes.[64] Suffice it to say, the Tenth Circuit was unequivocal that the debtor's Coal Act liability arose out of the Coal Act—not a contractual relationship between the coal operators and the Combined Fund and 1992 Benefit Plan.[65]

To be sure, none of the Circuit Courts of Appeal that have concluded that Coal Act premiums were taxes have confronted the precise issue in this case. But each of the courts applied the *Lorber* test. And this Court is unaware of any reason why the *Lorber* test wouldn't apply here to determine whether the unpaid Coal Act premiums at issue are taxes and therefore not discharged in U.S. Pipe's earlier bankruptcy case. Under the *Lorber* test, the Coal Act premiums are unquestionably a tax.

## Conclusion

This Court might be inclined to agree with U.S. Pipe if the Court were writing on a clean slate. But it is not. Numerous courts have used the *Lorber* test (or some variation of it) to determine whether a fee is a "constitutional" tax in a variety of bankruptcy contexts (as opposed to a "tax" for Anti-Injunction Act purposes). The Court is not aware of any reason why the *Lorber* test wouldn't apply here.

---

[63] *Id.*

[64] *Id.*

[65] *Id.* at 1278.

Nor is the Court aware of—and U.S. Pipe has not cited—any federal court decision that has considered whether Coal Act premiums are taxes under the *Lorber* test and concluded that they are not. Because the Coal Act premiums are an involuntary pecuniary burden imposed by Congress for a public purpose under its taxing power, the Court reaches the same conclusion that every Circuit Court of Appeal that has considered the issue has: The Coal Act premiums are taxes. And because they are taxes assessed on a periodic basis (either annually or monthly), each period gives rise to a new liability.

Accordingly, the Court will enter a separate judgment finding in favor of the Trustees, as a matter of law, that their Coal Act claims were not discharged in U.S. Pipe's earlier bankruptcy case and that the Trustees didn't violate the discharge injunction by suing U.S. Pipe under the Coal Act.

> Attorney Stephanie C. Lieb is directed to serve a copy of this Memorandum Opinion on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the Opinion.

**Stephanie C. Lieb, Esq.**
  Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.
*Counsel for Defendants*

**Scott A. Stichter, Esq.**
  Stichter, Riedel, Blain & Postler
*Counsel for Plaintiff*